IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:11-CT-03045-FL

| | |
|---|---|
| DAVID RICHARDSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) MEMORANDUM AND |
| | ) RECOMMENDATION |
| | ) |
| OFFICER BOSTICK, et al., | ) |
| | ) |
| Defendants. | ) |

This case comes before the court upon Plaintiff David Richardson's ("Plaintiff") Motion for

Default Judgment as to Defendants Captain Beck ("Beck"), Sergeant Bell ("Bell"), and Officer

Wheeler ("Wheeler") (collectively "Defendants"), to which Defendants did not respond. [DE-131].

Plaintiff, a North Carolina inmate, filed his original complaint on March 7, 2011. [DE-3]. In his

complaint, Plaintiff accused Defendants of physically assaulting him while he was an inmate at a

correctional facility where Defendants worked as guards and officers. [DE-58, -59]. Wheeler

answered the complaint on October 19, 2011. [DE-30]. Thereafter, Plaintiff filed an amended

complaint on August 14, 2012, and default was entered as to Wheeler on January 21, 2014. [DE-70,

-120]. Plaintiff has now moved for default judgment as to these three Defendants. [DE-131]. The

motion was referred to the undersigned and the court held an evidentiary hearing on March 31, 2014,

to establish the truth of Plaintiff's allegations and to determine the amount of damages, if any, to

which Plaintiff may be entitled. *See* Fed. R. Civ. P. 55(b)(2)(B)-(C). For the reasons stated herein,

the undersigned recommends granting Plaintiff's motion for default judgment and awarding Plaintiff

$32,000.00 in damages.

# I. PROCEDURAL HISTORY

On March 7, 2011, Plaintiff, acting through counsel North Carolina Prisoner Legal Services, filed a complaint ("complaint" or "original complaint") asserting claims under 42 U.S.C. § 1983 for violation of the Eighth and Fourteenth Amendments to the United States Constitution. Plaintiff's claims arise out of a series of three assaults against him on March 21, 2008, while he was a state inmate at Maury Correctional Institution ("Maury") in Greene County, North Carolina. Compl. [DE-3] ¶¶ 1, 6-20. The complaint named as defendants six officers of the North Carolina Department of Correction:[1] Officer Anderson, Officer Beamon, Captain Beck, Sergeant Bell, Officer Bostick, and Officer Wheeler. *Id.* at 1. Plaintiff, a black male, alleged that Bell, Bostick, and Wheeler physically assaulted him and that the other officers were present and took no action to stop the assaults and, in certain instances, otherwise facilitated them. *Id.* ¶¶ 7-16. Plaintiff asserted joint and several liability of defendants, alleging specifically that "[t]hroughout the abuse of Plaintiff . . . , the Defendants acted in concert with one another, in mutual support and agreement for the deprivation of Plaintiff's rights under the Constitution of the United States and the Constitution and laws of North Carolina." *Id.* ¶¶ 20, 25.

Each of the defendants was served with the complaint, [DE-13-16, -34, -35], but only Anderson, Beamon, and Wheeler filed answers, [DE-30, -31, -36]. On March 6, 2012, upon motion of Plaintiff, the Clerk entered default against Beck [DE-58], Bell [DE-59], and Bostick [DE-60]. On June 8, 2012, Beamon was dismissed from the lawsuit having resolved all claims between himself and Plaintiff. [DE-65].

---

[1] Effective January 1, 2012, the State of North Carolina reorganized and consolidated a number of executive agencies, and the Department of Correction is now the Division of Adult Correction, a unit of the Department of Public Safety. *See* N.C. Gen. Stat. § 143B-600(a)(1).

2

On August 14, 2012, Plaintiff filed an amended complaint. Am. Compl. [DE-70]. The principal changes from the original complaint were to add two defendants, Officer Matthew Scott Lennon and Assistant Superintendent Harold Person, *id.* at 1, and allegations about a group of officers, the Good Ol' Boys, who allegedly assaulted black inmates on a regular basis, *id.* ¶¶ 20-42. According to the amended complaint, Officer Lennon was a member of the Good Ol' Boys and witnessed the assaults on Plaintiff without taking action to stop them. *Id.* ¶¶ 6, 10, 12. Person allegedly supervised Beck, Bell, and Bostick; was aware that they, Wheeler, Lennon, and others, were members of the Good Ol' Boys; and received reports of the assaults on Plaintiff as well as other assaults committed by the Good Ol' Boys, but did nothing to stop them. *Id.* ¶¶ 21, 23-44. The amended complaint also includes additional details about events alleged in the original complaint. *Id.* at 2-12. The amended complaint asserts no new causes of action. Thus, it asserts against all Defendants materially the same claims alleged in the original complaint and again expressly alleges joint and several liability of all Defendants. *Id.* ¶ 50.

On August 16, 2012, Anderson was dismissed from the lawsuit having resolved all claims between himself and Plaintiff. [DE-71]. Lennon and Person subsequently answered the amended complaint. [DE-82, -85]. The other remaining Defendants, Beck, Bell, Bostick, and Wheeler, did not.[2] On December 3, 2012, the Clerk issued a notice to Plaintiff directing him to take steps by December 24, 2012, under Fed. R. Civ. P. 55(b) to reduce the entries of default against Beck, Bell, and Bostick on the original complaint to judgment. [DE-86]. In response, Plaintiff filed a motion

---

[2] Fed. R. Civ. P. 5(a)(2) requires that a party who is in default for failing to appear be served with an amended pleading and that such service be under Fed. R. Civ. P. 4 when the amended pleading asserts a new claim for relief against the party. Because the amended complaint asserts no new claims for relief against Beck, Bell, or Bostick, plaintiff was not required under Rule 5(a)(2) to serve it on them. Plaintiff nevertheless did serve them, albeit by mail, not under Rule 4. *See* Am. Compl. (cert. of serv.) at 14.

on December 18, 2012, for entry of default judgment against them. [DE-90]. On June 20, 2013, upon adopting the recommendation of the magistrate judge, the district court denied without prejudice Plaintiff's motion for default judgment. [DE-106, -108]. On November 26, 2013, Person and Bostick were dismissed from the lawsuit and the court directed Plaintiff to inform the court how he seeks to proceed against Wheeler. [DE-113]. In response, Plaintiff filed a motion on December 1, 2013, for entry of default judgment against Wheeler. [DE-114]. The Clerk made entry of default against Wheeler on the amended complaint on January 21, 2014. [DE-120]. Plaintiff and Lennon participated in a court-hosted settlement conference on February 19, 2014, whereby the parties reached a settlement agreement and Lennon was subsequently dismissed. [DE-125, -141]. On February 27, 2014, the Clerk issued a notice to Plaintiff directing him to take steps within twenty-one days under Fed. R. Civ. P. 55(b) to reduce the entries of default against Beck, Bell, and Wheeler, the remaining defendants, to judgment. [DE-128]. In response, Plaintiff filed the instant motion on March 10, 2014, for entry of default judgment against them.

## II. STATEMENT OF THE FACTS

The undersigned held a hearing on March 31, 2014. At the hearing, Plaintiff was the only witness. Plaintiff introduced one exhibit which included his relevant medical records. Pl.'s Ex. A. As developed at the hearing, this action arose out of events that occurred at Maury on March 21, 2008, while Plaintiff was an inmate housed in the grey unit. Plaintiff described the grey unit as a maximum security unit on lock-down 24 hours each day, with one inmate to a cell, and protocol requiring an inmate be in full restraints whenever outside his cell.[3] In his testimony, Plaintiff also

---

[3] Plaintiff described full restraints as handcuffs, ankle shackles and a waist chain, with the handcuffs secured to the waist chain.

4

described a group of correctional officers assigned to the grey unit, consisting of officers and supervisors, who were primarily white and assaulted non-white inmates in the unit.[4] Plaintiff testified that the officers who assaulted him were members of this group. Additionally, Plaintiff testified that Beck and Bell held supervisory roles within the prison and outranked the other correctional officers like Bostick and Wheeler. As Captain, Beck was the highest ranking officer on the grey unit and was referred to as the Officer-in-Charge.

On March 21, 2008, Plaintiff's cell door opened unexpectedly while Plaintiff was lying on his bed reading a book completely unrestrained.[5] Plaintiff knew of previous instances where officers would "pop open" an inmate's cell door and three to four officers "run in [the] cell" to fight the inmate. Plaintiff did not know what was happening when his cell door opened so he went into "attack mode." Plaintiff exited his cell and attacked Officer Price who was escorting another Maury inmate, Derrick Johnson, presumably back from the recreation unit. Plaintiff also attacked inmate Johnson. Officer Price and other officers tried to pull Plaintiff off of inmate Johnson. Plaintiff finally relented, submitted to handcuffs, and was returned to his cell uninjured.

Sometime thereafter, Wheeler came to Plaintiff's cell door and told Plaintiff that he was going to be rewarded for "getting" inmate Johnson. Wheeler later returned to Plaintiff's cell and told Plaintiff he was being taken to the medical unit. Wheeler proceeded to place Plaintiff in handcuffs and when his cell door opened, Plaintiff saw Bostick for the first time standing outside his cell. The

---

[4] All officers were white except for Bell, whom Plaintiff described as "Indian."

[5] Plaintiff described the cell door opening as unusual since inmates on the grey unit had to be in handcuffs prior to officers opening the cell door. The standard practice is for officers to open the smaller trap door located on the cell door, for the inmate to position his hands through the trap door opening for officers to secure handcuffs, and then for the full cell door to open so the officers could enter the cell to secure the inmate in full restraints.

5

two officers placed Plaintiff in full restraints and escorted Plaintiff out of his cell. They walked Plaintiff to an area in the block hallway not monitored by surveillance cameras. Beck was standing in the hallway and asked Bostick "is that the inmate?", referring to Plaintiff, to which Bostick nodded in the affirmative. Beck then shook his head at Bostick, which Plaintiff described as a signal for Bostick to begin assaulting Plaintiff. Bostick grabbed Plaintiff by the neck and choked him, slammed his head to the wall several times and then threw Plaintiff to the ground and began kicking him repeatedly. Plaintiff called Bostick a coward which prompted Bostick to kick Plaintiff in the mouth and call him a "n****r," all while laughing. The other officers, including Wheeler, stood by watching Bostick assault Plaintiff. No officer intervened or otherwise attempted to stop the altercation. The assault occurred within view of a number of inmates who began yelling and kicking on their doors for the officers to stop. Afterwards, Wheeler picked Plaintiff up and escorted him to the medical unit.

Plaintiff testified his mouth was split open and bleeding. Plaintiff told the medical unit nurse that he had been assaulted by the officers, but Bostick, Beck, and Wheeler said aloud in front of the nurse that they did not see anyone assault Plaintiff. Plaintiff stated that Wheeler turned red in the face and looked scared when Beck asked Wheeler, somewhat facetiously, whether he saw an officer assault Plaintiff. While in the medical unit, Bostick directed further verbal threats at Plaintiff with Wheeler and Beck watching nearby. Specifically, Bostick held his metal baton, which he referred to as "Black Beauty," and repeatedly tapped it against the palm of his hand while claiming he would use it on Plaintiff. Bostick also taunted Plaintiff saying "I told you I would get you," referring to an earlier incident between Plaintiff and Bostick when Plaintiff first arrived at Maury. Beck left the medical unit while Plaintiff was still being treated by the nurse.

6

The officers placed Plaintiff in a holding cell, or "cage" as described by Plaintiff, once they left the medical unit. While in the "cage," Plaintiff testified that Beck asked Plaintiff why he assaulted his officer, referring to Officer Price from the earlier incident that day. While Plaintiff was in the "cage," Bostick instructed officers to throw away all of Plaintiff's belongings in his cell. Bostick returned, accompanied by Bell, to the "cage" to retrieve Plaintiff. The officers began to walk Plaintiff back to the grey unit, but rather than return Plaintiff to his cell, they walked him to another area that was unmonitored by surveillance cameras. Here, Bostick proceeded to assault Plaintiff for a second time, using his metal baton to repeatedly strike Plaintiff on all parts of his body while Plaintiff was still in full restraints and on the ground. Plaintiff testified that Bell was standing next to Bostick and may have kicked Plaintiff, although Plaintiff cannot say with certainty. Plaintiff does not know if Beck was present in the surrounding area during this assault. Inmates in nearby recreation cages saw Plaintiff being assaulted and began to make noise. Next, Plaintiff was taken to an empty cell in B Block. Plaintiff was bleeding and lying on the floor unable to stand up. Bell and Bostick both began beating Plaintiff, for a third time, with their batons while Plaintiff was on the ground and in full restraints. Bell and Bostick left Plaintiff in the cell after they finished beating Plaintiff.

Officer McCotter located Plaintiff in the cell, lying on the floor, and retrieved a nurse to assist transporting Plaintiff in a wheelchair back to the medical unit. The medical unit staff evaluated Plaintiff and advised that Plaintiff be sent to the hospital, but Plaintiff refused to go because the same officers responsible for assaulting him, or their associates, would be responsible for transporting him to the hospital. Plaintiff feared being beaten a fourth time while being transported to the hospital. Plaintiff waited until the shift change when Captain Edwards came on duty to replace Beck and then

7

consented to being transported to the hospital for treatment.

Plaintiff presented to Pitt County Memorial Hospital at approximately 10:00 p.m. on March 21, 2008. Pl.'s Ex. A at 1. The emergency department treatment notes document the following as to Plaintiff's condition: abrasions and small lacerations to the lip, ears, and shoulders; swollen upper lip; redness to upper back; multiple puncture type wounds to the frontal area of bilateral shins; swelling to right ankle and right clavicle; abrasions to bilateral ankles; gauze dressing affixed to bilateral legs and ear. *Id.* Plaintiff was administered percocet for his pain, which he rated at a level of 8 to 10, and underwent several X-rays. *Id.* at 1, 3-5. Medical staff cleaned the blood and scrapes on Plaintiff's body. The lacerations on Plaintiff's ear and lower legs were approximately one centimeter in length. *Id.* at 5-6. Plaintiff received a total of four staples to close the lacerations on his legs and 2 stitches on his ear. *Id.* at 5-6. Plaintiff returned to Maury and was placed back into his unit on March 22, 2008. *Id.* at 9, 11. Plaintiff was given a percocet prescription to continue once he left the hospital, but was administered ibuprofen at Maury. *Id.* at 14. Plaintiff had his staples and stitches removed on April 3, 2008. *Id.* at 12. At this date, Plaintiff was still experiencing pain and his ankles and wrists remained swollen from where the cuffs had pressed into his skin during the assault. Plaintiff testified he continues to experience pain in his lower back region which he attributes to the assaults.

Following the assaults, Plaintiff periodically treated with a psychiatrist. Plaintiff testified he experiences anxiety while around correctional officers and has fearful thoughts about the assaults and being in a helpless situation. Plaintiff sometimes experiences break-out sweats where his heart rate is elevated. Plaintiff testified the assaults against him have changed him and prevent him from trusting people and officers. According to Plaintiff, the psychiatrist tried to place him on medication

8

to manage his psychological symptoms, but Plaintiff refused the medication because he believes it is a crutch. Plaintiff has not produced and the court does not have any medical records which chronicle Plaintiff's mental health treatment.

Beck and Bell were both criminally charged and convicted in Greene County, North Carolina, for felony conspiracy under N.C. Gen. Stat. § 14-2.4(A) (conspiracy to commit a felony) for the events that transpired in connection with Plaintiff. Each received a suspended sentence of 36 months supervised probation.

## III. LEGAL STANDARD

Once default has been entered under Rule 55(a) of the Federal Rules of Civil Procedure, Rule 55(b)(2) authorizes the court to enter default judgment against a properly served defendant who fails to file a timely responsive pleading. Upon default, the well-pleaded facts alleged in the complaint, as to liability, are deemed admitted. *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001). However, "a default is not treated as an absolute confession by the defendant of his liability and of the plaintiff's right to recover." *Id.* (quoting *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)). Rather, the court must consider whether the unchallenged facts support the relief sought. *Id.*

If the court determines that liability is established, it then must determine the appropriate amount of damages. Unlike allegations of fact, "[e]ven when a default judgment is warranted based on a party's failure to defend, the allegations in the complaint with respect to the amount of the damages are not deemed true." *See Credit Lyonnais Secs. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999). The court must make an independent determination regarding such allegations by, for example, conducting an evidentiary hearing. Fed. R. Civ. P. 55(b)(2)(B).

9

## IV. DISCUSSION

In the instant case, Plaintiff is pursuing a claim under 42 U.S.C. § 1983 and seeks monetary damages for the pain and suffering caused by the physical assaults. Plaintiff seeks default judgment against Beck, Bell, and Wheeler. Accepting all of the factual allegations of Plaintiff's complaint as true, this court must therefore determine whether Plaintiff has established a claim against these Defendants and, if so, the amount of damages to which he may be entitled.

### A.  Liability

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993). However, not every injury suffered by a prisoner establishes liability against a prison official. The Eighth Amendment prohibits the infliction of "cruel and unusual punishments" on prisoners, which includes the "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 318 (1986) (internal quotation marks and citations omitted). Often, prison officials are accused of violating the Eighth Amendment based on alleged use of excessive physical force. *Hudson v. McMillian*, 503 U.S. 1 (1992). To succeed on an Eighth Amendment excessive force claim, a prisoner must show that "the prison official acted with a sufficiently culpable state of mind (subjective component) and . . . the injury inflicted on the inmate was sufficiently serious (objective component)." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (recognizing a two-pronged test for excessive force claims). With regard to the objective component, "[t]he Eighth Amendment's prohibition . . . necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind."

10

*Hudson*, 503 U.S. at 9-10 (internal quotation marks and citations omitted). It has been held that "absent the most extraordinary circumstances, a plaintiff cannot prevail on an Eighth Amendment excessive force claim if his injury is *de minimis*." *Norman v. Taylor*, 25 F.3d 1259, 1263 (4th Cir. 1994) (en banc); *see also Iko*, 535 F.3d at 238 (holding that "[a]n injury is sufficiently serious for purposes of the objective component of an Eighth Amendment excessive force claim as long as it rises above the level of *de minimis* harm"). Extraordinary circumstances exist where the use of force is "repugnant to the conscience of mankind . . . or the pain itself will be such that it can properly be said to constitute more than *de minimis* injury." *Norman*, 25 F.3d at 1263 n.4 (internal quotation marks and citation omitted).

Second, as to the subjective component, a prisoner must demonstrate that the prison official had a "sufficiently culpable state of mind." *Bacchus v. Scarborough*, 466 F. App'x 269, 270 (4th Cir. 2012) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). In a claim for excessive force, that requisite state of mind is "wantonness in the infliction of pain." *Whitley*, 475 U.S. at 322. In determining whether a prison official has acted with "wantonness," we consider: the necessity for the application of force; the relationship between the need for force and the amount of force used; the extent of the injury inflicted; the extent of the threat to the safety of the staff and other prisoners, as reasonably perceived by the responsible officials based on the facts known to them at the time; and the efforts, if any, taken by the officials to temper the severity of the force applied. *See Hudson*, 503 U.S. at 7.

If not accused of excessive force, a prison official may also be liable under the Eighth Amendment for failing to "take reasonable measures to guarantee the safety of the inmates." *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984); *see Smith v. Mensinger*, 293 F.3d 641, 651 (3d Cir. 2002)

11

("The restriction on cruel and unusual punishment contained in the Eighth Amendment reaches non-intervention just as readily as it reaches the more demonstrable brutality of those who unjustifiably and excessively employ fists, boots or clubs."). "Knowing of, but disregarding, an excessive risk to an inmate's health or safety is referred to as deliberate indifference." *Wilson v. Graham*, No. 1:08-CV-202, 2009 WL 1973702, at *6 (N.D.W. Va. July 7, 2009) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) ("A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment.")). "Unlike a claim of excessive force, which requires physical contact between parties, a claim of deliberate indifference is viable if the plaintiff can show the defendant acted, or failed to act, despite knowledge of a substantial risk of serious harm." *Id.* (citation omitted). Deliberate indifference is a "state of mind more blameworthy than negligence" and lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other," being commonly described as recklessness. *Farmer*, 511 U.S. at 835. As such, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Plaintiff succeeds on both prongs of the analysis for an excessive force claim against Bell.[6] Bell assaulted Plaintiff with his baton during the third assault occurring in the empty cell where Plaintiff was taken following the two prior beatings.[7] Plaintiff has satisfied the objective prong of the Eighth Amendment test because he has shown that he sustained a serious physical injury as a

---

[6] Beck and Wheeler's involvement in the use of force is too tangential to support an excessive force claim. Beck did seemingly direct or condone the assaults on Plaintiff, but Beck personally did not use unnecessary force. Wheeler also did not personally use unnecessary force. However, as discussed below, Beck and Wheeler are liable because they failed to intervene to stop the use of excessive force by other officers.

[7] Plaintiff testified that Bell may have kicked him during the second assault in the hallway, but it was difficult for Plaintiff to see who, besides Bostick, made contact with him.

result of the physical assaults on March 21, 2008. Plaintiff testified, in conjunction with the allegations in his complaint, that he received lacerations to his right ear and left and right shins which required staples and/or stitches to close the wounds. *See Porter v. City of Detroit*, 639 F. Supp. 589, 594 (E.D. Mich. 1986) (recognizing that a claim cannot generally rise to a constitutional level with no visible cuts, bruises, bleeding, or torn clothing). The medical records admitted into evidence at the evidentiary hearing establish the same. At Pitt County Memorial Hospital, Plaintiff received a total of four staples in his lower legs and two stitches in his ear. Pl.'s Ex. A at 5-6. Additionally, Plaintiff suffered abrasions and swelling to his upper lip, right ear, upper back and shoulders, and both ankles. *Id.* at 1. Plaintiff was administered percocet by the emergency room medical staff to help control his pain from the assaults. Taken together, Plaintiff's injuries were more than *de minimis*.

Additionally, after careful evaluation of the evidence, this court concludes that Plaintiff has shown that Bell possessed the required "culpable state of mind." The evidence presented at the hearing indicated that Plaintiff's actions failed to justify the level of force used against him. Plaintiff testified that he was in full restraints and was not resisting or threatening the officers while being escorted outside his cell, thereby showing there was no plausible basis for the force employed by Defendants. *See Whitley*, 475 U.S. at 323 (noting that liability requires a showing that there was no plausible basis for the official to use the degree of force employed); *Barnard v. Piedmont Reg'l Jail Auth.*, No. 3:07-CV-566, 2009 WL 2872510, at \*3 (E.D. Va. Sept. 3, 2009) (finding that plaintiff kept arms crossed, stared at the floor, never cursed, threatened, or lunged at defendants). Moreover, the prior disturbance earlier in the day between Plaintiff and Officer Price cannot serve as a justification for the beating where no exigency continued to exist at the time of the assaults. *See*

13

*Romaine v. Rawson*, 140 F. Supp. 2d 204, 213 (N.D.N.Y. 2001) ("[W]hen . . . all parties admit that no amount of force was needed to maintain discipline and security within the prison, guards cannot physically assault prisoners simply because they are angry at them."). Indeed, the physical contact by Defendants, primarily by Bostick and Bell, was not simply an act of physical force, but more akin to an act of brutality. Plaintiff's head was slammed against the wall, he was repeatedly beaten with batons while curled on the ground in full restraints, and verbally taunted with racial slurs. *See Bacchus*, 466 F. App'x at 271 (vacating district court's grant of summary judgment where officer verbally taunted plaintiff and repeatedly used his knee to apply force to plaintiff's head after inmate had been incapacitated). The record also contains evidence that Bostick threatened Plaintiff with "Black Beauty," the name used for his baton, and Plaintiff testified that he was aware of a group of primarily white officers that routinely beat black inmates, all suggesting that the assaults were motivated by an improper purpose and largely unprovoked. Following the third and final assault, Defendants abandoned Plaintiff in a cell and did not take him to the medical unit for examination despite bleeding and multiple lacerations, including one to the head. Plaintiff was unable to stand up after the series of assaults. The injuries inflicted by Defendants necessitated that Plaintiff be treated by emergency room staff at Pitt Memorial County Hospital. The court also takes judicial notice of Beck and Bell's felony criminal convictions resulting from the physical assaults against Plaintiff which further support the absence of a legitimate goal of prison administration in assaulting Plaintiff.[8] Accordingly, considering the totality of the circumstances, Plaintiff has established the

---

[8] Plaintiff submitted copies of North Carolina judgments of conviction for Beck and Bell in conjunction with his prehearing memorandum for default judgment. [DE-136-2]. The undersigned takes judicial notice of these judgments. *See United States v. Stanley*, 449 F. App'x 249, 250 n.2 (4th Cir. 2011) (taking judicial notice of North Carolina judgments of conviction).

14

necessary state of mind as to Bell. The force used and the injuries sustained were more than *de minimis*. The undersigned therefore finds Bell liable for his use of excessive force which violated Plaintiff's rights under the Eighth Amendment.

Plaintiff also succeeds on claims of deliberate indifference against Beck and Wheeler. Concerning Beck, the record supports that Beck maintained a supervisory role over the unit's correctional officers and went so far as to direct or acquiesce in the assaults against Plaintiff by officers under his supervision. Plaintiff testified that when he was first removed from his cell, before the first assault occurred, Beck asked Bostick whether Plaintiff was "the inmate" and Plaintiff observed Beck and Bostick exchange head nods in the hallway just before Bostick began striking Plaintiff out of view of prison surveillance. Beck observed Bostick beat Plaintiff while in full restraints and defenseless, and did not intervene at any point. Additionally, Beck was present in the medical unit after the first assault when Bostick was threatening Plaintiff with his baton. This leaves no question as to whether Beck was aware of the assaults and consciously disregarded a risk to Plaintiff's health or safety. Beck may not have been present for the subsequent assaults against Plaintiff, but he left Plaintiff attended by Bostick and other officers, with the full knowledge that Plaintiff was being threatened by the use of batons. Beck gave no instruction that the officers should refrain from further assaulting Plaintiff. *See Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (3d Cir. 1995) (finding sufficient facts to infer that the defendant officer was aware of how the plaintiffs were being treated by other officers even though defendant officer may not have directly observed the altercation).

Wheeler was also present for at least the first assault against Plaintiff in the hallway and the fact that he was not a ranking official does not shield him from liability. *See Smith*, 293 F.3d at 650

15

("Furthermore, we hold that a corrections officer can not escape liability by relying upon his inferior or non-supervisory rank vis-a-vis the other officers."). While Plaintiff alleges that Wheeler was present for subsequent assaults, at the evidentiary hearing Plaintiff could not recollect whether Wheeler was present. Regardless, Wheeler observed the first assault within close proximity and did not intervene to prevent harm to Plaintiff. Additionally, Wheeler heard Bostick's threats of hitting Plaintiff with his baton and stood by while Plaintiff, in full restraints, continued to be escorted by Bostick. The undersigned therefore finds Beck and Wheeler liable for their failure to intervene and stop the use of excessive force by other officers.[9]

Therefore, given that the unchallenged facts constitute a legitimate cause of action, the undersigned finds Plaintiff is entitled to default judgment against Beck, Bell, and Wheeler and hereby recommends that default judgment be entered against all three Defendants.

B. Damages

The remaining issue is therefore one of damages. Section 1983 creates "a species of tort liability," *Carey v. Piphus*, 435 U.S. 247, 253 (1978), and, therefore, "when § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts." *Memphis Cnty. Sch. Dist. v. Stachura*, 477 U.S. 299, 306 (1986). "To that end, compensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as 'impairment of reputation . . ., personal humiliation, and mental anguish and suffering.'" *Id.* at 307 (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974)). "Deterrence is also an important purpose of this system, but it

_____

[9] Arguably, Bell could be found liable under this theory as well having observed the second assault in the hallway, but having found Bell liable for using excessive force, the court will not address this additional matter.

16

operates through the mechanism of damages that are *compensatory*—damages grounded in determinations of plaintiffs' actual losses." *Id.* "It is axiomatic that where several independent actors concurrently or consecutively produce a single, indivisible injury, each actor will be held jointly and severally liable for the entire injury." *Watts v. Laurent*, 774 F.2d 168, 179 (7th Cir. 1985) (recognizing principles of joint and several liability under section 1983). Absent proof of actual injury or compensatory damages, the court is limited to awarding a plaintiff nominal damages in the amount of one dollar. *See Farrar v. Hobby*, 506 U.S. 103, 112 (1992); *Williams v. Griffin*, 952 F.2d 820, 825 n.2 (4th Cir. 1991).

The Prison Litigation Reform Act ("PLRA") establishes limitations on recovery of compensatory damages by prisoners in civil lawsuits by providing that "no Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e; *see also Miller v. Clark*, No. 3:11-CV-00557, 2011 WL 6955512, at *3 (S.D.W. Va. Dec. 9, 2011) ("Moreover, to maintain a plausible claim for compensatory damages, the prisoner must assert and prove that a physical injury resulted from the violation. Allegations of an emotional injury without an underlying physical injury are insufficient to support an award of compensatory damages."). Plaintiff has satisfied the PLRA requirements of physical injury. Plaintiff received multiple lacerations on his body, physical bruising, and swelling from the series of assaults.

Plaintiff, through counsel, seeks compensatory damages in the amount of $4,000.00 as to each Defendant for pain and suffering. Here, Plaintiff incurred injuries which required medical treatment and resulted in severe pain. Plaintiff was transported from Maury to the emergency room at Pitt County Memorial Hospital where he received numerous staples and sutures to close open

17

lacerations on his body. Plaintiff did not have these staples and sutures removed until approximately two weeks later. Plaintiff experienced a great deal of physical pain both during and after the assaults and was administered percocet while at the hospital. Hospital medical staff gave Plaintiff a percocet prescription at discharge, although he took a non-prescription pain reliever once back at Maury. Plaintiff testified that he treated with a psychiatrist a few times following the assaults, but refuses to be on any mediation, and occasionally experiences episodes of profuse sweating which are accompanied by a racing heart rate. Following the assaults, Plaintiff is anxious around correctional officers and has fearful thoughts about the assaults.

There is sufficient evidence here for an award of compensatory damages and the undersigned recommends compensatory damages be awarded to Plaintiff in the amount of $10,000.00. *See Jackson v. Austin*, 241 F. Supp. 2d 1313, 1323 (D. Kan. 2003) (awarding $15,000.00 compensatory damages where officers applied weight to prisoner's bad leg causing pain and then placed prisoner in excessively tight handcuffs); *Thomson v. Jones*, 619 F. Supp. 745, 754 (N.D. Ill. 1985) (awarding $25,000.00 compensatory damages on excessive force claim for permanent hearing loss, pain and suffering, and other physical injuries). Because the injuries Defendants inflicted on Plaintiff are indivisible, Beck, Bell and Wheeler are each jointly and severally liable for the entire amount of compensatory damages. *Jackson*, 241 F. Supp. 2d at 1323 (holding the three defendants jointly and severally liable).

Punitive damages may also be awarded to plaintiffs in a section 1983 action "to deter or punish malicious deprivations of rights." *Carey*, 435 U.S. at 266. "Punitive damages are available in an action under § 1983 'when the defendant's conduct is shown to be motivated by evil intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *See*

18

*Carrington v. Easley*, No. 5:08-CT-3175-FL, 2011 WL 2132850, at \*4 (E.D.N.C. May 25, 2011) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Punitive damages are discretionary and are "matters appropriate for individualized determination." *McFadden v. Sanchez*, 710 F.2d 907, 913 (2d Cir. 1983) (relying on *Smith* to hold that the "function of punitive damages in section 1983 suits points forcefully toward assessing individually each defendant's liability"); *see Barnard*, 2009 WL 2872510, at \*6 (awarding varying amounts of punitive damages against individual defendants based on their degree of culpability). "Moreover, 'punitive damages may be the only significant remedy available in some § 1983 actions where constitutional rights are maliciously violated but the victim cannot prove compensable injury." *Id.* (quoting *Carlson v. Green*, 446 U.S. 14, 22 n.9 (1980)).

Here, the record shows that the assaults on Plaintiff were motivated by evil motive and intent and were carried out with reckless and callous disregard to Plaintiff's federally protected rights. Although the officers each contributed to Plaintiff's ultimate injury and harm, the undersigned does not find these three defendants equally culpable as it relates to an award of punitive damages. Wheeler decidedly is the least culpable actor in this group having not applied direct force to Plaintiff or otherwise directed such assaults. The undersigned finds Beck and Bell's conduct to be more egregious and reprehensible given their supervisory role in the jail. *See Barnard*, 2009 WL 2872510, at \*5 (recognizing that the sergeant defendant had the greatest culpability because he was in charge of the other officers and led the assault). As discussed above, Bell, a supervisory officer within Maury applied force "maliciously and sadistically" for the very purpose of causing harm to Plaintiff. Specifically, Bell repeatedly struck Plaintiff with his baton, while Plaintiff was on the ground, defenseless, and had already been brutally beaten twice before. Beck, an even higher ranking officer than Bell, directed and acquiesced to the assaults against Plaintiff. Moreover, Beck observed Bostick

19

assault Plaintiff on the first occasion, slamming Plaintiff's head into the wall and then kicking and beating Plaintiff on the ground, and failed to intervene. Beck also left Plaintiff in the custody and control of Bostick and other officers after having watched Bostick threaten Plaintiff with his baton and shout racial slurs at Plaintiff. Both Bell and Beck were convicted in the Superior Court of North Carolina for felony conspiracy. Considering separate awards of punitive damages against these Defendants, the undersigned recommends that Plaintiff be awarded punitive damages in the amount of $10,000.00 each from Beck and Bell and $2,000.00 from Wheeler. *See Jackson*, 241 F. Supp. 2d at 1323 (awarding $30,000 punitive damages where officers applied weight to prisoner's bad leg causing pain and then placed prisoner in excessively tight handcuffs).

## V. CONCLUSION

In accordance with the foregoing, the undersigned RECOMMENDS that Plaintiff's motion for default judgment be GRANTED as to Beck, Bell, and Wheeler and that Plaintiff be awarded compensatory damages in the amount of $10,000.00, jointly and severally, as to Beck, Bell and Wheeler, and punitive damages of $10,000.00 each from Beck and Bell and $2,000.00 from Wheeler, for total damages of $32,000.00

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

20

SO SUBMITTED, the 30th day of April 2014.

Robert B. Jones, Jr.
United States Magistrate Judge